## Case ·No. 1,564.

### The BLOSSOM.

[Olc. 188;[1]  6 N. Y. Leg. Obs. 374;  1 Am. Law J. (N. S.) 354.]

District Court, S. D. New York.   Sept. Term, 1845.

COLLISION—BETWEEN SAILING VESSELS—MODE OF STEERING — VESSEL WITH WIND FREE MEETING VESSEL CLOSE-HAULED — LIGHTS — LOOKOUT— DAMAGES—CONSEQUENTIAL DAMAGES.

1. It is not culpable or improper conduct for the officer or deck to take the helm of a vessel, and to receive and act upon the direction of the look-out as to the mode of steering her.

2. A vessel running with the wind free, must give way to another close-hauled, without regard to their respective tacks.

[Cited in The Maria and Elizabeth, 7 Fed. 255.]

[See The Rebecca, Case No. 11.618; The Argus, Id. 521; The Thomas Martin, Id. 13,-926; Allen v. Mackay, Id. 228.]

3. Sailing vessels, coming into port in the night time, are not bound to carry lights.

4. Pilot-boats, equally with other vessels, are guilty of gross negligence by running in the night time without a competent look-out stationed forward on the deck.

[Cited in The Ancon, Case No. 348; Ciancimines Tow & Transp. Co. v. The Ripple, 41 Fed. 64.]

5. The man at the wheel is not a sufficient watch to fulfill the obligations of the boat in that respect.

[See The Tillie, Case No. 14,049.]

6. The damages in case of collision, to be adjudged against the party in fault, must be sufficient to restore the injured vessel to the condition she was in at the time of the collision.

[See The New Jersey. Case No. 10,162; The Granite State, 3 Wall. (70 U. S.) 310.]

7. Actual injuries only are to be compensated for. The courts do not consider hypothetical or consequential damages.

[See The Narragansett, Case No. 10,019.]

In admiralty. This suit was instituted for the recovery of damages occasioned by a collision, on the 19th day of December, 1843, at sea, in the night, a few miles off Sandy Hook, between the schooner Harriet Smith, owned by the libellant, and the pilot-boat Blossom, owned by the claimants. The schooner was coming into this port from sea, and the pilot-boat was on her way out in pursuit of pilotage business. By the pleadings and proofs it appears the wind was about W. S. W., the schooner was heading about N. N. W., and pilot-boat about S. S. E. All these were estimated courses. The schooner was struck about a foot forward of her stern, on the starboard quarter. Three stanchions were broken, part of the taffrail split, the bulwark torn about eight feet, and the whole stern racked and broken by the blow. The repairs cost thirty-one 30-100 dollars, but the ship-carpenter testified that in his judgment, the injury to the schooner, in consequence of the collision, was from two hundred and fifty to three hundred dollars, and that the schooner

[1] [Reported by Edward R. Olcott, Esq.]

could not be replaced in a condition as good as before the injury without taking up her deck, and taking out the knees, &c. She was well manned and found.

The pilot-boat was outward bound on a cruise, with a complement of six persons on board, all of whom, except one, an apprentice at the helm, were below at the time of the collision. The night was dark; and so dark, it was contended for the claimants, that it was impracticable to discover the schooner far enough off to afford the pilot-boat any way to avoid her. The pilot-boat carried a lantern under her bow. She had no look-out forward, and no person on deck other than the man at the helm. The schooner had two men stationed forward on the look-out, one on the lee and the other on the weather bow. They and the mate, who was at the helm, testified that they saw the light of the pilot-boat the distance, they supposed, of a mile or more off, and the two on the watch both saw the boat itself coming upon them several times its length off, before she struck the schooner. The schooner showed no light. There was contradictory evidence respecting the usage or custom on the coast for sailing vessels to carry lights, and also as to the utility and prudence of doing so. The mate of the schooner took the helm, and ordered the men keeping the look-out to give him directions how to steer in respect to objects ahead. Evidence was given by the claimants to show the custom and usage of pilot-boats off this port to run in the night time with no more men on deck than the one at the helm.

W. Q. Morton, for libellants.
F. B. Cutting, for claimants.

BETTS, District Judge. It was argued for the pilot-boat that there was carelessness and want of due care and precaution in not carrying a light on board the schooner, and also in the officer of the deck taking the helm himself, and trusting to a common sailor to keep a look-out, and give orders how to steer. I do not consider those suggestions of any weight, because, if the mate had taken a position on the quarter-deck or midships, he must have shaped his orders to the helmsman from the report of the look-out. Indeed, I apprehend the uniform usage is for the look-out to cry the direction to be given the helm, and for that call to be obeyed instantly, unless countermanded by an officer. The maritime law does not oblige sailing vessels to carry lights at sea in dark weather.

The testimony as to the extreme darkness of the night is in conflict between the witnesses on board the pilot-boat and those on the schooner. The preponderance in numbers is with the latter, and their opportunity for observation was also superior to that of the others; and the opinion given by the schooner's men, that the night was not so dark but that the schooner might, at the time, be seen from another a distance far enough off to avoid her, is corroborated strongly by the occurrences succeeding the collision.

Immediately after striking the schooner, the pilot-boat glanced past her stern, was brought about into the wind, in order to ascertain her own damages, &c. The men below ran on deck, and one of them testifies, that after he got there, the vessels had separated, and he supposes were twenty yards apart, and that the schooner was under way going ahead. It is not to be supposed, in the confusion of such a moment, that the witness could estimate time or distance with any accuracy, and the circumstances tend to prove that the vessels must have separated more than twenty yards, and probably five times that distance, when so seen by him. When they struck, both were under full way, with a united speed of ten or twelve knots, and the headway of either was not apparently checked by the collision. The schooner's stern was canted off to windward, and her bow thrown round more leeward, so that her sails were nearly filled, and this position would more probably increase than retard her speed. The supposed movement of the two in opposite directions being about 1,760 yards (one mile) in five minutes. they would separate twenty yards in four seconds; and if only half a minute is allowed for the witness to be wakened by the shock, get on deck and make his observation, the vessels would, at that rate, be 140 or 150 yards apart. Almost instantly after the collision, another pilot-boat hailed the schooner, and asked if she wanted a pilot. Accordingly, she must have been seen from the pilot-boat, and it was judged by the sound of the hail she was 100 yards distant. In my opinion, the claimants do not succeed in proving the collision was owing to the extreme darkness of the night, and thus an inevitable accident.

The clear weight of evidence is, that it was not so dark but that the schooner could have been seen from the Blosson at the time, at such distance as to have enabled the pilot-boat easily to escape her.

It is strenuously argued for the claimants, that the schooner must be considered running with the wind free, or if she was on the wind, her larboard tacks were on board, and that accordingly it was her duty to give way for the Blossom, which was going close-hauled, with her starboard tacks on board, and was thus privileged to hold her course. That accordingly the fault of navigation, in this respect, was with the schooner. This state of the schooner is deduced from the course of the wind, and her steering, as estimated by the witnesses; and in the judgment of nautical men upon those data, the schooner must have been on a free wind. The statements of the points of the wind or course of the vessel are not made from observations of

the compass; they are merely the judgments of witnesses, and may doubtless be deemed correct in a general sense; yet the fact is explicitly testified to by three witnesses, who were on the deck of the schooner, that she was close-hauled, hugging the wind, and the helmsman of the Blossom says his boat was running out free, with the sheet off. These facts must outweigh all hypotheses drawn from charts or diagrams framed upon the supposed line of direction of either vessel. The fact positively asserted by uncontradicted witnesses, that the schooner was close-hauled upon the wind, that the pilot-boat was running free when they met, overbears all opinions of experts, that on the given course of the wind and steering of the vessels, both of them ought to have been alike close-hauled or running free. The nautical rule is clear and positive in such case, that the vessel sailing free must avoid the one close-hauled, if not prevented by insuperable obstacles. 2 Dod. 85; 3 Hagg. Adm. 318; Westminster Review, No. 42, p. 65; 3 Kent, Comm. 230. On these facts it was the duty of the pilot-boat to give way, leaving her free course to the schooner. I do not, however. make this the controlling consideration in the case. nor give weight to other particulars urged on the hearing, as that the schooner, being laden and inward bound, was entitled to keep her way under like circumstances against an outward-bound vessel in ballast; or that trading craft have that privilege specially in relation to pilot-boats, whose business it is to edge close upon vessels coming into port, to speak and board them if necessary, and are not to be regarded as having the privilege of vessels making regular voyages. But, in concurrence with the leading authorities in the federal courts and in England, I hold the pilot-boat did not use due care and precaution in running along the coast in the night time without having a competent lookout properly stationed on her deck. The Rebecca, [Case No. 11,618]; 3 Kent, Comm. 230; Story, Bailm. § 611; The Chester, 3 Hagg. Adm. 317. It was culpable negligence to trust this duty to the helmsman alone. His attention must be essentially occupied with his own vessel, and her safe management will leave him imperfect means for observing objects outside of her; and if he may occasionally take a view off her, yet that is not his chief or most important employment. In the case of The Emily [Case No. 4,453], in this court, this point was fully considered; and the vessel which had not a look-out properly stationed, independent of the helmsman, was pronounced in fault, and liable for injuries sustained by collision with others, which were managed with ordinary care and skill. The same rule must be applied in this case. The claimants fail proving the alleged custom and usage of running pilot-boats in the night time, without a look-out properly stationed forward, independent of the helmsman.

Such usage, however largely practiced, could never be received in a maritime court as a justification. It is repugnant to all sound rules of navigation, and palpably dangerous to life and property at sea. I should not hesitate to pronounce it grossly culpable conduct to sail a vessel in the night without a sufficient watch stationed forward on her deck, whatever evidence might be given of the practice or custom in that respect. The more general such practice shall prevail, the more necessary it would become for the courts to discountenance and correct it by the severest condemnation and penalties.

I do not regard the accident one inevitable to both parties, but hold, on the proofs, that it resulted from the want of due skill and care on the part of the Blossom.

The damages of the libellant are not to be limited to the mere cost of repairing the schooner. The libellant is entitled to a reparation of his actual injury, that is, his vessel should be made to him staunch and serviceable to a like degree as she was before the collision; but he cannot recover for supposable or consequential damages. The repairs made did not place her in the sound condition she was before this injury; nor is an estimate given of what it will cost to take up the deck, and replace knees, &c.; and in the absence of such estimate, it may be safely concluded that a like expenditure with that already made, will be needed to furnish such repair.

I accordingly decree that the libellant recover $62.60, with his costs to be taxed; but as this valuation may be regarded by the parties below or beyond the actual value of the work required, leave is given to either party to take a reference on the point, as to what it would cost to place the schooner in as serviceable a state as she was before the collision. If both parties do not unite in the reference, then it is to be taken at the expense of the one asking it.